ERUNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KARL N. WINGFIELD, : | |
| 16513 Governor Bridge Road : | |
| Bowie, MD 20716-3658 : | |
| : | |
| Plaintiff, : | |
| v.  : | Civil Action No.: _____ |
| : | |
| OFFICE OF THE ARCHITECT : | |
| OF THE CAPITOL, : | |
| SB-16 U.S. Capitol : | |
| U.S. Capitol Building : | |
| Washington, D.C. 20515 : | |
| : | |
| Serve: Stephen Ayers : | |
| Architect of the Capitol : | |
| Office of the Architect of the : | |
| Capitol : | |
| Washington, D.C. 20515 : | |
| (in his official capacity) : | |
| : | |
| Serve: Attorney General of the : | |
| U.S., Jefferson Sessions or : | |
| his designated representative : | |
| U.S. Department of Justice : | |
| 950 Pennsylvania Ave, N.W. : | |
| Washington, D.C. 20530 : | |
| : | |
| Serve: Jessie K. Liu : | |
| U.S. Attorney for the District : | |
| of Columbia : | |
| 555 4th Street, N.W. : | |
| Washington, D.C. 20530 : | |
| : | |
| Defendant. : | |

## **COMPLAINT**

Plaintiff Karl N. Wingfield, through counsel HANNON LAW GROUP, LLP, sues

Defendant Office of the Architect of the Capitol under the Federal Tort Claims Act, 28 U.S.C. §

1346(b)(1), and says:

## INTRODUCTION

Karl N. Wingfield ("Wingfield") seeks compensation for pain and suffering caused by mold toxin exposure while working at the Thurgood Marshall Federal Judiciary Building in Washington, D.C. The Architect of the Capitol, which owned the building, knew it was contaminated with hazardous mold but failed to remediate the condition. After working in this hazardous environment for nearly nine months, Wingfield suffered peripheral nerve damage, impaired breathing and balance, joint and muscle pain, fatigue, chronic sinusitis, sleep disorder, and depression. He remains unable to work at the same level as he did prior to his injuries.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically, the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) ("FCTA").

2. This Court also has jurisdiction over the subject matter of this complaint pursuant to the FTCA's express statement of jurisdiction, 28 U.S.C. § 1346.

3. Venue in this district is appropriate pursuant to 28 U.S.C. § 1391, because the Architect of the Capitol is located in this district and because the events giving rise to Wingfield's claim occurred in this district.

## PARTIES

4. Karl N. Wingfield is a natural person who resides at 16513 Governor Bridge Road, in Bowie, Maryland 20716. From November 2014 through August 2015, Wingfield worked as a project manager at the Thurgood Marshall Building.

5. Defendant Architect of the Capitol ("AOC") is an independent agency within the legislative branch of the United States Government and its principle office is located at the United States Capitol Building. The AOC is the builder and steward of landmark buildings and grounds of Capitol Hill. Among those buildings is the Thurgood Marshall Federal Judiciary Building located at 1 Columbus Circle Northeast, Washington, D.C. 20544. The building houses agencies that support the work of the United States Federal Courts, including the Administrative Office of the United States Courts, the Federal Judicial Center, and the United States Sentencing Commission.

## FACTS COMMON TO ALL COUNTS

**Known Air Quality Deficiencies**

6. In March 2005, the AOC commissioned Entech Engineering, Inc., to evaluate the ventilation system in the Thurgood Marshall Building. Entech found that it lacked reheat coils, which help control humidity in the summer. Entech warned that high humidity could contribute to mold growth. In its report, Entech said this was a "high" priority and recommended that the AOC install additional reheat coils at an estimated cost of $1,135,073.

7. Upon information and belief, the AOC did not follow Entech's recommendation.

8. In July 2009, the AOC commissioned Entech for a second evaluation of the Thurgood Marshall Building's ventilation system. The building's air supply and exhaust fans were in the underground garage and provided ventilation for the entire building. Entech found that the system still used the original fans, which had become extremely dirty, and that many fan

louvers were broken. In its second report, Entech described this as an "immediate" priority and recommended that AOC overhaul the supply and exhaust fans at an estimated cost of $804,554.

9. Upon information and belief, the AOC did not follow Entech's recommendation.

**CMI Hires Wingfield**

10. At all times relevant to this complaint, the AOC contracted with a facilities management company, CMI Management, Inc. ("CMI") to manage the Thurgood Marshall Building.

11. The AOC had the obligation and the right to control and direct CMI's management of the Thurgood Marshall Building. The AOC's approval was necessary for any maintenance expenditures and capital improvements. The AOC's property manager, Lenny Caudill, served as the AOC's liaison with CMI.

12. In November 2014, CMI hired Wingfield to serve as a project manager at the Thurgood Marshall Building. In this role, Wingfield was CMI's liaison with the AOC and managed all maintenance and capital improvements for the building.

13. Wingfield's office was in the basement floor of Thurgood Marshall Building, known as the C-level. His office had one makeshift air vent located in the ceiling that was unable to heat or cool the air. The office did not have any return air vents to enable the air to circulate throughout the space.

**Wingfield Complains About Air Quality**

14. Wingfield's predecessor remained with CMI for a few weeks to train him. When Wingfield asked about the ventilation in his office, she said the electrical board powering the air

4

handling units ("AHU") that fed air to his office had burned out, rendering the system inoperable. She said this problem existed for as long as she could remember.

15. Within a week or two of beginning work, Wingfield complained about the air quality on the C-level to his supervisor, CMI Property Manager Kenneth Dodson. Wingfield told Dodson his office did not have proper ventilation and that it caused him difficulty breathing and light-headedness. Wingfield also told Dodson he smelled exhaust fumes in the office. Dodson replied that he did not smell anything and that no one else complained about the air.

16. In December 2014, CMI hired a firm called Healthy Buildings International, Inc., to perform an air quality inspection at the Thurgood Marshall Building. Healthy Buildings reported that the impetus for the inspection were "occupant complaints of sinus inflammation, allergies, headaches and coughing in the C-level Locksmith Office."

17. Healthy Buildings found mold on the insulation inside AHU 45—the unit that supplied air to Wingfield's office suite. Healthy Buildings said the mold was "extensive enough that we suggest replacement of the material."

18. Upon information and belief, neither CMI nor AOC followed these recommendations.

19. The air quality continued to deteriorate to the point that in March 2015, Wingfield and a coworker began wearing masks while working in their offices to filter the air they breathed. Wingfield wore a mask in his office for the remainder of his employment.

20. In April 2015, CMI solicited another air quality inspection. Healthy Buildings submitted a proposal for a "Rapid Response Focused Indoor Air Quality Inspection" for the C-

5

level offices. The proposal noted that the "area has been the site of recent occupant concerns about the air quality."

21. Around this time, Wingfield spoke with CMI Building Engineer Kenneth Smith about the poor air quality in his office and asked if there was something he could do to improve the situation. Smith said he would talk to Dodson and get back to him. Wingfield never heard back.

22. Several other employees who worked in the Thurgood Marshall Building began developing symptoms:

    a. Wingfield spoke with two maintenance technicians who worked near Wingfield's office. They told Wingfield they complained to Dodson about the air quality since 2013 but nothing was done. They also said they had been hospitalized for inflammation, difficulty breathing, chest pain, and joint pain.

    b. Smith, who shared an office with Wingfield, also began experiencing symptoms during this time. His symptoms included fatigue, pneumonia, and bronchitis.

    c. CMI receptionist Maria Recco also became ill. Her work area was located near Wingfield's office and she suffered fatigue, pneumonia, and coughing.

23. Wingfield then spoke to Dodson and CMI Assistant Property Manager Steven Dolan. Wingfield told them something was wrong with the air circulation in his office. Dolan agreed that the air was "stuffy" but said there was nothing he could do.

24. The following day, Wingfield brought a vacuum cleaner to work hoping that vacuuming the carpet would improve the air quality. The air quality did not improve.

25. By May 2015, the conditions became unbearable. Wingfield tried performing all his administrative duties—generating reports, developing project presentations, etc.—from the cafeteria located in a different part of the C-level. He did this for about a week before Dodson ordered him to return to his office.

26. In mid-May 2015, Wingfield received permission to replace the carpet in his office, hoping it may help improve the air quality. Unfortunately, Wingfield's symptoms continued to progress. He suffered difficulty breathing, headaches, dizziness, and pain in his neck, shoulder, and chest. At times he required a cane to walk. Wingfield continued to make complaints to supervisors, including Dodson, Dolan, and Smith, to no avail.

27. In late May 2015, CMI hired a company called A Plus Enviro-Services to clean the air ducts for the C-level offices. The total cost was $2,432.

28. On June 19, 2015, Healthy Buildings performed mold test of AHU 45, the unit that supplied air for Wingfield's office. On June 24, 2015, it issued a report that once again recommended removal of contaminated insulation:

> The analytical results showed the suspect mold inside the fan chamber of AHU 45 were *Cladosporium* and *Penicillium* molds. Unless addressed, this mold is liable to spread to other areas of the building through the supply air system. Once internal

7

insulation becomes contaminated with mold, surface cleaning may not be sufficient to prevent re-growth. Therefore, we recommend that the affected sections of insulation be cut out and replaced with new insulation or the affected areas should be cleaned and encapsulated.

29. Upon information and belief, neither CMI nor AOC followed these recommendations.

**Wingfield Hospitalized for Toxic Mold Exposure**

30. Wingfield's health continued to deteriorate and on the morning of July 13, 2015, he awoke with severe pain in his chest, shoulders, and back. He also suffered shortness of breath, dizziness, and impaired balanced. Wingfield checked himself into Laurel Regional Hospital where he was admitted for observation. Doctors treated him for symptoms related to chronic mold exposure.

31. While in the hospital, Wingfield sent an email to CMI explaining that he was in the hospital and unable to report to work. CMI replied by identifying alleged deficiencies in Wingfield's work performance. This was the first time CMI raised these issues. Wingfield promised to address the concerns as soon as he returned to work.

32. Wingfield was diagnosed with myalgia (muscle soreness), atypical chest pain, and bilateral shoulder pain. The treating physician proscribed pain medication, and instructed him to follow up with his primary care physician within one week. He was discharged from the hospital on July 15, 2015, but was not cleared to work.

33. That same day, CMI issued Wingfield a Performance Improvement Notice ("PIN") by email, complaining of Wingfield's lack of communication to CMI management and their clients.

34. Shortly after his discharge, Wingfield received the results from blood tests conducted at the hospital. The tests showed bio toxins from the mold had entered his blood stream and his muscles, causing the muscle soreness and pain in his chest and shoulders.

**AOC and CMI Finally Address the Mold**

35. Only after learning of Wingfield's hospitalization did the AOC and CMI act to remediate the mold. On July 14, 2015, Dodson emailed Vincent Huang, Administrative Office of the U.S. Courts, saying he was "growing concerned about the amount of mold" in the AHUs, and warning that "the last thing we need is a sick building claim against the government."

36. Later that day, Dolan emailed Healthy Buildings for a quote for mold removal. He attached the 2005 and 2009 reports from Entech and said, "[t]his unit was found to have some mold growth (see enclosure), and we'd like to have all the insulation removed, interior of the unit cleaned with biocide solution including the squirrel cage fan and re-insulated and re-assembled."

37. Healthy Buildings performed a mold and moisture inspection the same day and found mold in several locations. The report said that "unless addressed this mold is liable to spread to other areas of the building through the supply air systems."

38. Dodson instructed his engineers not to enter the mechanical room for one of the AHUs where Healthy Buildings found level-4 mold. He also told Smith to refer any maintenance questions from the AOC to Dodson.

9

39. Dolan then asked Healthy Buildings for additional air sampling of C-260—Wingfield's office suit—explaining that he needed to "fortify our position that we've been proactive to remedy any potential health issue[s] in a timely manner."

40. Healthy Buildings inspected C-260 on July 23, 2015 and again found mold on the insulation inside AHU 45. Health Buildings recommended the mold be removed.

41. The next day, Dolan showed another AHU to AOC Facility Operations Manager Kris Foote. Foote told Dolan he "was shocked by the amount of sheer dirt, grime, dust along with the extensive mold both inside the unit, the ductwork and on the external surfaces of the unit."

42. When Dolan relayed Foote's comments to Smith, Smith replied that "[t]his mold has been there for awhile." He said the mold in AHU 45 "has been a problem for months with nothing done all [k]new about this."

### CMI Terminates Wingfield

43. Wingfield had not yet returned to work when, on July 27, 2015, he received a letter from The Hartford, CMI's insurer, stating that a workers' compensation claim was filed for him. Wingfield called The Hartford and explained that he had not filed a claim, but the representative told him CMI notified them he was injured at work.

44. On August 4, 2015, CMI fired Wingfield. Human Resources Director Selena Mims issued a letter claiming the decision was based on a PIN issued to Wingfield on July 27, 2015. Wingfield had not received the PIN, but a copy was attached to the termination letter.

Although dated July 27, 2015, the form was signed by Mims on August 4, 2015 and said, "we will make this day, August 4, 2015, your last day of employment with CMI."

45.   On the PIN dated July 27, 2015, Mims claimed Wingfield had received two prior PINs, but failed to improve his performance. She said the first PIN was issued on July 2, 2015, for "lack of attention to detail," and the second, a "final written warning PIN" dated July 15, 2015, was sent to him by email because "you have been absent from work since 07/13/2015." This was the PIN Wingfield received while in the hospital.

**Continuing Mold Issues at the Thurgood Marshall Building**

46.   After terminating Wingfield, the AOC and CMI continued to struggle with mold. On August 26, 2015, Dolan hired a company to replace moldy ceiling tiles in the G-310, directly above the C-level. The same day, Dolan emailed Dodson and Smith asking, "Do we have someone that could go to this area and safely look above the ceiling for potential water leaks? Something has to be creating this fungus haven…"

47.   Dolan then asked Healthy Buildings to sample the mold and generate a report. He warned there was "a severe allergy situation in room 3-348," also on the G-level, and requested an air sampling as well.

48.   That same evening, Dolan emailed Huang and Vivian Murphy, employees of the Administrative Office of the U.S. Courts, "I'm scheduling A-1 environmental to replace about 8 moldy ceiling tiles and clean the supply air duct/diffuser in the G-310 suite. We'll also be checking out the cause of the mold, along with sampling to determine the type. It's unusual to see this amount growing on ceiling tiles."

49. On September 10, 2015, Charles Garascia, AOC Facility Operations Specialist, acknowledged that mold was discovered in G-544 and that the property manager received a work order request and had commenced addressing the issue.

50. Employee complaints continued. On September 28, 2015, Gwen Coleman, an employee in the Administrative Office of the US Courts reported: "I recently moved to room 2-286. Almost immediately I noticed that several people in the area were coughing. Now I'm coughing. I heard that people who were in this area previously also had a cough. Would someone please check the air quality[?]"

**Wingfield Continues to Suffer from Mold Exposure**

51. In November 2015, Wingfield underwent a psychological evaluation at George Washington Psychiatry. Wingfield reported the toll the mold exposure, and his termination had caused him and his family. He was unable to work, drive, or do the things he used to do around the house. He expressed anger about the AOC's lack of disclosure of the mold and was diagnosed with Major Depression.

52. On March 15, 2016, Wingfield received a medical examination from Alan R. Vinitsky, M.D, to determine the cause of his injuries reported on July 13, 2015 and the effects these injuries would have on his ability to work. The test results showed the presence of mycotoxins (mold toxins), and he was diagnosed with toxic encephalopathy, polyneuropathy due to toxins, chronic pansinusitis and sinusitis, malaise, fatigue, asthma, hypertension, and sleep disorder.

53. On April 4, 2016, Dr. Vinitsky issued a follow-up medical report. In his report, he noted that "to a reasonable degree of medical certainty, Karl Wingfield was injured during his employment for CMI, while he was assigned to work in the Thurgood Marshall Building… The specific cause of his work-related injury was chronic exposure to a contaminated environment, that included mold, mycotoxins (mold toxins), and mixed microbes, and the metabolic products resulting from the contamination." The report lists various symptoms resulting from the mold exposure, including impaired breathing, pain and discomfort in arms and chest, restricted movement and weakness of back and legs, severely impaired balance, sinus and nasal congestion, and cognitive changes and mentation such as attentiveness and memory loss. Dr. Vinitsky also determined that Wingfield "may not return to work for a minimum of one year, but may require three years before he can physically return to work."

**Wingfield's Worker's Compensation Claim**

54. On July 23, 2015, Wingfield's workers' compensation claim was filed with the District of Columbia Office of Workers' Compensation.

55. Both CMI and its insurer, The Hartford, contested his claim because of purported lack of medical documentation to support that his injuries were work related.

56. After nearly a year of litigation, Wingfield settled his worker's compensation claim with CMI and The Hartford, which was approved by the Office of Workers' Compensation on July 13, 2016.

**Wingfield's Administrative Complaint**

57. On January 11, 2017, Wingfield filed an administrative claim seeking monetary damages for the injuries he suffered while working in the Thurgood Marshall Building with the Office of the Architect of the Capitol pursuant to the Federal Tort Claims Act.

58. On April 16, 2018, Defendant Architect of the Capitol issued its decision denying Wingfield's claim.

## COUNT I:
## PREMISE LIABILITY

59. All the preceding allegations are incorporated herein.

60. Wingfield worked as an employee within the Thurgood Marshall Building under the jurisdiction of Defendant Architect of the Capitol.

61. Defendant Architect of the Capitol was responsible for operating and maintaining this government property and owed a duty to keep the premises free of hazardous conditions, including mold toxins, or to otherwise provide a safe premises.

62. Defendant Architect of the Capitol failed to keep the premises free of hazardous conditions, or to otherwise provide a safe premises.

63. Defendant Architect of the Capitol had actual or constructive knowledge of the presence of mold toxins within the Thurgood Marshall Building, including the area near and around Wingfield's workspace.

64. Defendant Architect of the Capitol had actual or constructive knowledge of the foreseeable danger that the presence of mold posed to invitees, tenants, employees, guests, and

visitors of the Thurgood Marshall Building, but failed to remediate the issue until after learning that Wingfield was hospitalized.

65. As a direct and proximate result of Defendant Architect of the Capitol's failure to protect building invitees, tenants, employees, guests, and visitors from a known danger, Wingfield was exposed to mold toxins and suffered, and continues to suffer physical and emotional damages.

## COUNT II:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

66. All of the preceding allegations are incorporated herein.

67. Defendant Architect of the Capitol owed Wingfield a duty to maintain a safe premises free of hazardous conditions.

68. Defendant Architect of the Capitol behaved negligently in failing to maintain a safe premises.

69. There is an especially likely risk that Defendant Architect of the Capitol's failure to maintain a safe premises would cause serious emotional distress to Wingfield.

70. As a direct and proximate cause of Defendant Architect of the Capitol's negligent conduct, Wingfield was exposed to mold toxins and suffered, and continues to suffer serious and verifiable physical and emotional distress.

## COUNT III:
## NEGLIGENT SUPERVISION

71. All the preceding allegations are incorporated herein.

15

72. Defendant Architect of the Capitol employed CMI Management Inc. to manage the Thurgood Marshall Building, including maintaining a safe premises free of hazardous conditions.

73. Defendant Architect of the Capitol had a duty to supervise, inspect and monitor CMI Management Inc.'s performance in managing the Thurgood Marshall Building.

74. Defendant Architect of the Capitol had actual or constructive knowledge of the presence of mold toxins within the Thurgood Marshall Building, including the area near and around Wingfield's workspace.

75. Defendant Architect of the Capitol had actual or constructive knowledge of the foreseeable danger that the presence of mold posed to invitees, tenants, employees, guests, and visitors of the Thurgood Marshall Building, but failed to adequately supervise CMI Management Inc.'s performance to ensure that the premises was kept free of hazardous conditions.

76. CMI Management Inc. failed to maintain a safe premises free of hazardous conditions, or otherwise provide a safe premises.

77. CMI Management Inc.'s failure to maintain a safe premises free of hazardous conditions harmed Wingfield.

78. As a direct and proximate cause of Defendant Architect of the Capitol's negligent supervision of CMI Management Inc., Wingfield was exposed to mold toxins and suffered, and continues to suffer physical and emotional injury.

16

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Karl N. Wingfield prays that he be awarded compensatory damages in the amount of $600,000, and payment of costs and attorneys' fees associated with this action.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues of fact and law raised by the allegations in this Complaint.

Respectfully Submitted,

HANNON LAW GROUP, LLP

*/s/ Daniel S. Crowley*
Daniel S. Crowley, Bar No. 989874
Talon R. Hurst, Bar No. 1031716
333 8th Street, N.E.
Washington, D.C. 20002
(202) 232-1907
(202) 232-3704, Facsimile
dcrowley@hannonlawgroup.com
thurst@hannonlawgroup.com

*Attorneys for Plaintiff Karl N. Wingfield*